**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

ROBERT EARL THOMAS,
Petitioner,

v. Case No. 8:23-cv-748-JLB-LSG

SECRETARY, DEPARTMENT
OF CORRECTIONS,
Respondent.
_________________________________/

**ORDER**

Robert Earl Thomas, a Florida prisoner serving a forty-year sentence for second-degree murder, filed a *pro se* Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254. (Doc. 13). After careful review of the entire file, the petition (*id.*), the response in opposition (Doc. 17), and Thomas's reply (Doc. 22), the petition is denied.

## I. Background and Procedural History

A Florida jury convicted Thomas of second-degree murder. (Doc. 5-2, Ex. 14). The state trial court sentenced him to 40 years' imprisonment. (Doc. 5-2, Exs. 15, 16). The state appellate court *per curiam* affirmed the conviction and sentence. (Doc. 5-2, Ex. 22).

Thomas sought postconviction relief under Florida Rule of Criminal Procedure 3.850. (Doc. 5-2, Ex. 24). Following an evidentiary hearing, the state court denied Thomas's motion. (Doc. 5-2, Ex. 37). The state appellate court *per curiam* affirmed that denial. (Doc. 5-2, Ex. 42). The state appellate court also

denied Thomas's petition alleging ineffective assistance of appellate counsel, filed under Florida Rule of Appellate Procedure 9.141(d). (Doc. 5-2, Exs. 45 and 46).

## II. Factual Summary[1]

On the evening of July 16, 2013, Thomas, Dwayne Martin, and William Austin Hatfield were socializing at Martin's house in Tampa. (Doc. 5-2, Ex. 12 at 344–45). They were all "a little buzzed" after consuming alcohol and drugs. (*Id*. at 345). Martin and Thomas had met each other through Hatfield, their mutual friend. (*Id*. at 336–38).

Hatfield left Martin's house and went home around 8:30 p.m. (*Id*. at 357–58). When he left, Hatfield saw Thomas standing and talking to Martin. (*Id*. at 358-59). Martin's adult daughter, Kristal Murphy, stopped by the house between 8:45 and 8:50 p.m. (*Id*. at 278–79). She saw Thomas sitting at the kitchen table. (*Id*. at 279). Murphy did not know Thomas, and she felt uncomfortable when she noticed Thomas looking at her jewelry. (*Id*. at 284–87). But she neither thought that either Thomas or Martin seemed angry, nor did she think Martin was intoxicated. (*Id*. at 284, 288). The only people she saw at the house were Thomas and Martin. (*Id*. at 289–90). Murphy stayed at the house briefly before leaving. (*Id*. at 287).

Around 9:30 p.m., Hatfield and his friend, Kristin Leonard, left his house to walk to a liquor store. (*Id*. at 362–63). Hatfield decided to stop at Martin's house to see if Martin wanted anything from the store. (*Id*. at 363). As he approached, Hatfield saw that the door to the house was open. (*Id*.). He walked up to the door

---

[1] The factual summary is based on the trial transcript.

and saw Martin lying on the floor near the laundry area. (*Id*. at 363–64). Martin did not respond when Hatfield told him to get up, so Hatfield entered the house. (*Id*. at 364). He could tell that Martin was not breathing, and he could not find Martin's pulse. (*Id*. at 364–65). Police soon responded to Leonard's 911 call. (*Id*. at 365–66).

One of the first officers to respond was Deveka Myles. (*Id*. at 444–45). Thomas approached Officer Myles, who noticed that Thomas was intoxicated. (*Id*. at 447–48). Thomas asked Officer Myles what she was doing there. (*Id*.). Thomas told her that he had been with Martin and Hatfield that night. (*Id*. at 456–57). Thomas said he had known Martin for only a few weeks and that they had some differences, but he considered Martin a friend. (*Id*. at 457–58). Thomas stated that Martin "spoke . . . with his hands" and would touch the person he was talking to, which Thomas did not like. (*Id*. at 456–57). Thomas told Officer Myles that he left Martin's house at the same time as Hatfield and went home. (*Id*. at 460–61).

Detectives Mike Kirlangitis and Scott Bullard also responded. Detective Kirlangitis observed that Thomas had "a busted lip" and blood on his shirt. (*Id*. at 538). He also saw what looked like blood smears inside the home. (*Id*. at 540-41). Detective Bullard noticed that Thomas had what appeared to be injuries on his face. (*Id*. at 629, 639). Thomas said that his injuries were from a car accident several weeks earlier, and also said that he had fallen earlier that day. (*Id*. at 634). Thomas told Detective Bullard that he did not go beyond the house's kitchen area that night. (*Id*. at 631). Thomas told Detective Bullard that he did not fight with

Martin that night, that Martin did not attack him, and that he left the house right after Hatfield at around 8:30 p.m. (*Id*. at 634–35).

When Thomas was arrested on September 17, 2013, he stated that he did not remember seeing Kristal Murphy at Martin's house. (*Id*. at 680, 690–91). He said he had only been to the house once before and had never gone farther into the house than the kitchen. (*Id*. at 680–81). Thomas denied that Martin had hit him or that they had a physical altercation. (*Id*. at 681). Thomas said that he left Martin's house at the same time as Hatfield, and that when he left, Martin was drunk but was still alive. (*Id*. at 682–83). He said the scrapes on his face were likely from a fall earlier that day. (*Id*. at 683–84).

Two of Thomas's friends, Leroy Nelson and Stacy Mackabee, testified that Thomas talked to them separately the day after Martin's death. Thomas said Martin was "touchy-feely" and had been "messing with him" by touching him. (*Id*. at 832, 844). According to both Nelson and Mackabee, Thomas said that he and Martin got into an altercation. (*Id*. at 834, 843, 844–45).

Thomas told Nelson that when he left, Martin was groaning on the floor. (*Id*. at 834-35). Thomas told Mackabee that he choked Martin and that he left after Martin yelled at him to get out. (*Id*. at 845). Thomas also told Nelson that he felt bad about what happened, so he returned to check on Martin. (*Id*. at 834). When he arrived, police were already there. (*Id*.).

Assistant medical examiner Dr. Elise Arbefeville, who performed Martin's autopsy, opined that he died of manual strangulation. (*Id.* at 769,788). Dr.

Arbefeville based her opinion on observations such as bruising on the neck, the fracture of Martin's hyoid bone, and the presence of blood around the hyoid bone. (*Id*. at 788-90). Dr. Arbefeville testified that a person could lose consciousness after ten to fifteen seconds of being manually strangled. (*Id*. at 793). She also estimated that it took between three and six minutes of being manually strangled for Martin to die. (*Id*. at 796, 826).

Dr. Arbefeville testified that there were numerous abrasions on the right side of Martin's neck, and only one on the left side. (*Id*. at 801). This pattern, she testified, was consistent with a person using his left hand to grab Martin's neck. (*Id*.). Thomas told police that he was left-handed. (*Id*. at 682). DNA testing of blood found in Martin's house and on Thomas's shirt matched Thomas's and Martin's DNA. (*Id*. at 856-57, 905-08). A partial DNA profile that matched Thomas was also found under Martin's fingernails. (*Id*. at 921).

## III. Legal Principles

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief under the AEDPA can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of § 2254(d)(1), a decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). The phrase "clearly established Federal law" encompasses the holdings only of the United States Supreme Court "as of the time of the relevant state-court decision." *Id.* at 412. A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

The AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694. As a result, to obtain relief under the AEDPA, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond

any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (stating that "[t]he state court's application of clearly established federal law must be objectively unreasonable" for a federal habeas petitioner to prevail and that the state court's "clear error" is insufficient).

Furthermore, when reviewing a claim under section 2254(d), a federal court must presume that any "determination of a factual issue made by a State court" is correct, and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e). A state court's summary rejection of a claim, even without explanation, qualifies as an adjudication on the merits that warrants deference. *Ferguson v. Culliver*, 527 F.3d 1144, 1146 (11th Cir. 2008).

**B. Ineffective Assistance of Counsel**

In *Strickland v. Washington*, the Supreme Court established a two-part test for determining whether a convicted person is entitled to relief on the ground that his counsel rendered ineffective assistance. 466 U.S. 668, 687–88 (1984). A petitioner must establish that counsel's performance was deficient and fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense. *Id.* A showing on only one prong will not support an ineffective assistance claim. *Id.* at 687 ("Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.").

The focus of inquiry under Strickland's performance prong is "reasonableness under prevailing professional norms." *Id.* at 688. In reviewing counsel's performance, a court must adhere to the presumption that "counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Id.* at 689 (citation omitted). A court must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct," applying a highly deferential level of judicial scrutiny. *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (quoting *Strickland*, 466 U.S. at 690). Proving *Strickland* prejudice "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687.

**C. Exhaustion and Procedural Default**

The AEDPA precludes federal courts, absent exceptional circumstances, from granting habeas relief unless a petitioner has exhausted all means of available relief under state law. 28 U.S.C. § 2254(b)(1). Exhaustion of state remedies requires that the state prisoner "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights[.]" *Duncan v. Henry*, 513 U.S. 364, 365 (1995). The petitioner must apprise the state court of the federal constitutional issue, not merely the underlying facts of the claim or a similar state law claim. *Snowden v. Singletary*, 135 F.3d 732, 735–36 (11th Cir. 1998). Under the similar doctrine of procedural default, "a federal court will not review the merits of claims, including constitutional claims, that a state

court declined to hear because the prisoner failed to abide by a state procedural rule." *Martinez v. Ryan*, 566 U.S. 1, 9 (2012).

A petitioner can avoid the application of the exhaustion or procedural default rules by establishing objective cause for failing to properly raise the claim in state court and actual prejudice from the alleged constitutional violation. *Spencer v. Sec'y, Dep't of Corr.*, 609 F.3d 1170, 1179–80 (11th Cir. 2010). To show cause, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). To show prejudice, a petitioner must demonstrate a reasonable probability that the outcome of the proceeding would have differed. *Crawford v. Head*, 311 F.3d 1288, 1327–28 (11th Cir. 2002).

A second exception, known as the "fundamental miscarriage of justice," only occurs in an extraordinary case, where a "constitutional violation has probably resulted in the conviction of one who is actually innocent[.]" *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

## IV. Discussion

### A. Ground One

Thomas argues that trial counsel was ineffective for not filing a pretrial motion for immunity from prosecution under Florida's "stand your ground" law. Thomas alleges he told counsel the following version of events: After Kristal Murphy left Martin's house on July 16, 2013, Thomas asked Martin if Murphy was

racist because of "her demeanor and comments." (Doc. 13 at 4).[2] Thomas and Martin got into an argument, and Martin "suddenly" attacked Thomas from behind. (Doc. 13 at 5). They fought and rolled around on the ground. (*Id.*). Thomas began to get up when Martin attacked him again. (*Id.*). Thomas fought back and put his hands around Martin's neck while Martin was still trying to attack him. (*Id.*). "Moments later," Martin slowed his attack, and Thomas backed away from him and left the house. (*Id.*).

Thomas argues that if counsel had filed a pretrial motion for immunity from prosecution, there is a reasonable probability that the charge would have been dismissed. (*Id.*) Under Florida law, a person is justified in using or threatening to use deadly force if the person reasonably believes that doing so is necessary to prevent imminent death or great bodily harm or to prevent the imminent commission of a forcible felony. Fla. Stat. § 776.012(2). A person using or threatening to use such force does not have a duty to retreat if the person is not engaged in a criminal activity and is in a place the person has a right to be. *Id.* When a person's actions are justified under section 776.012(2), he is immune from criminal prosecution. Fla. Stat. § 776.032(1).

At the postconviction evidentiary hearing, counsel testified that she investigated a defense of self-defense. (Doc. 5-2, Ex. 36 at 6–7). Counsel testified that Thomas told her he acted in self-defense when Martin attacked him and that

[2] Thomas notes in his petition that he is African American, and Kristal Murphy is white. (Doc. 13 at 4).

he believed Martin was still alive when he left. (*Id*. at 7–8). But counsel decided not to file a pretrial motion for immunity from prosecution. (*Id*. at 6–8).

Counsel testified about the factors that led her to this decision. She testified that Thomas's testimony at an immunity hearing would have been necessary because, under the then-applicable law, the defense bore the burden of showing entitlement to immunity from prosecution. (*Id*. at 8–9). Counsel believed that having Thomas testify carried a significant risk because, under the law at the time, statements he made during an immunity hearing could be used against him at trial. (*Id*. at 8–9).

Counsel also testified that Thomas told her that after the physical incident, he went into the back of the house and attempted to make the scene look like a robbery by knocking over a bookcase in one of the bedrooms. (*Id*. at 7–8). Thus, counsel stated, "it wasn't a case where Mr. Thomas's statement was, I reacted to him and I killed him. It was more complicated than that." (*Id*. at 8). Counsel felt certain that evidence of Thomas going to the back of the house and knocking over a bookcase would come out at an immunity hearing. (*Id*. at 12). She believed that such evidence was inconsistent with self-defense and that the prosecution would argue that it showed Thomas's consciousness of guilt, which "certainly is not something that [she] wanted in front of a jury." (*Id*. at 12–13).

Additionally, counsel testified, physical evidence that placed Thomas in the bedroom where the bookcase had been knocked over was inconsistent with

Thomas's statements to police that he never left the kitchen area of Martin's home. (*Id*. at 10–11).

Counsel testified that these considerations led her to make a strategic choice not to file a pretrial stand-your-ground motion. (*Id*. at 21–22). At the time of trial, counsel was a division chief in the Public Defender's Office and had been with that office for nine years. (*Id*. at 36–37). She had tried at least half a dozen homicide cases as first chair, and "more than that" as second chair. (*Id*. at 37). Counsel was familiar with defenses to the charge of second-degree murder. (*Id*.).

Thomas testified that he asked counsel about the stand-your-ground law. (*Id*. at 54). He testified that he did not see a downside in filing a motion for immunity from prosecution because "[e]ither we're going to win the stand your ground trial [sic] and I'm immune for trial, or . . . I'm going to lose, and we're going to trial. . . . Which we did anyway." (*Id*. at 55).

The state postconviction court denied Thomas's claim. After detailing the evidentiary hearing testimony, the state court found counsel's testimony more credible than Thomas's testimony. (Doc. 5-2, Ex. 37 at 17). The state court concluded that counsel made a reasonable strategic decision not to file a pretrial motion for immunity from prosecution. (*Id*. at 19). Accordingly, the state postconviction court found that Thomas had not shown that counsel performed deficiently or that he was prejudiced by counsel's performance. (*Id*.).

The state postconviction court's decision was reasonable. The state court's findings that counsel's testimony was credible and that counsel made a strategic

decision not to file a pretrial motion for immunity from prosecution are findings of fact that are presumed correct. *See Rolling v. Crosby*, 438 F.3d 1296, 1301 (11th Cir. 2006) ("The factual findings of the state court, including the credibility findings, are presumed to be correct unless [the petitioner] rebuts the presumption by clear and convincing evidence." (citing 28 U.S.C. § 2254(e)(1))); *Franks v. GDCP Warden*, 975 F.3d 1165, 1176 (11th Cir. 2020) ("The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact, and a state court's decision concerning that issue is presumptively correct." (quoting *Provenzano v. Singletary*, 148 F.3d 1327, 1330 (11th Cir. 1998))). Thomas has not rebutted, by clear and convincing evidence, the presumption of correctness afforded to the state court's factual findings.

According to testimony that the state postconviction court accepted as credible, counsel considered filing a pretrial immunity motion but decided against it. In particular, she was concerned that Thomas's pretrial hearing testimony would reveal problems with his self-defense theory and would be used against him at trial. She also worried that, at a trial, the prosecution would highlight the staged robbery to argue consciousness of guilt.

Counsel's strategic decisions "are entitled to a 'strong presumption' of reasonableness." *Dunn v. Reeves*, 594 U.S. 731, 739 (2021) (quoting *Harrington v. Richter*, 562 U.S. 86, 104 (2011)). And strategic decisions made "after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Parnell v. United States*, 149 F.4th 1268, 1287 (11th Cir. 2025)

(quoting *Strickland*, 466 U.S. at 690). Furthermore, a court's "strong reluctance to second-guess strategic decisions is even greater where those decisions were made by experienced criminal defense counsel." *Parnell*, 149 F.4th at 1289 (quoting *Provenzano*, 148 F.3d at 1328).

Counsel was an experienced criminal defense attorney who, after considering the likely consequences, made a strategic decision not to file a pretrial motion for immunity from prosecution. The record supports the state postconviction court's conclusion that this strategic decision was reasonable. Thomas has not shown that the state court's decision involved an unreasonable application of *Strickland* or was based on an unreasonable factual determination. Ground One does not warrant relief.

**B. Ground Two**

Thomas asserts that trial counsel was ineffective for "failing to insist" that he testify at trial to "exactly how the incident occurred." (Doc. 13 at 7). Thomas argues that counsel unreasonably "led [him] to believe" that his testimony was unnecessary because she could raise a reasonable doubt through cross-examining the State's witnesses and arguing to the jury. (*Id.*). If he had testified and presented his version of events, Thomas contends, there is a reasonable probability that the outcome of the trial would have been different. (*Id.* at 8).

At the postconviction evidentiary hearing, counsel testified that she spoke with Thomas several times about his rights to testify and to remain silent. (Doc. 5-2, Ex. 36 at 22). Counsel stated that they discussed the risks of testifying, including the

damaging effect of evidence showing the "imperfect" nature of Thomas's self-defense theory and the staged robbery. (*Id.*). Additionally, counsel had successfully moved to suppress some of Thomas's statements to law enforcement. (*Id.* at 23). The suppressed statements included some "very problematic admissions," including Thomas's statements that he either had his knee on Martin's chest or was straddling Martin on the ground and choked Martin. (*Id.* at 15-16, 48.) If Thomas took the stand and gave inconsistent testimony, counsel stated, the State could have used the suppressed statements to impeach him. (*Id.* at 23).

Counsel testified that she told Thomas what she believed to be the positives and negatives of testifying and advised him not to testify. (*Id.* at 24). Counsel also stated that she told Thomas whether to testify was his choice. (*Id.*). Thomas testified at the postconviction evidentiary hearing that he repeatedly told counsel that he wanted to testify at trial, but that counsel was "adamant" that he not do so. (*Id.* at 55). While Thomas acknowledged that he decided not to testify, he stated he did so based on counsel's alleged misadvice. (*Id.* at 56).

The state court denied Thomas's claim. It found that counsel's testimony was more credible than Thomas's testimony. (Doc. 5-2, Ex. 37 at 31). The state court found that counsel accurately advised Thomas about his right to testify or not testify, about the evidence, and about how she intended to argue his case. (*Id.*). The state court found that counsel made a "reasonable, proper recommendation that [Thomas] not testify." (*Id.*) The state court concluded that Thomas had not shown either prong of *Strickland*. (*Id.*).

The state court's ruling was reasonable. Thomas has not rebutted the presumption of correctness attached to the state court's finding that counsel's testimony was more credible than Thomas's testimony. *See Rolling*, 438 F.3d at 1301. A review of counsel's testimony reveals that she considered the benefits and risks of calling Thomas at trial before advising him not to testify. But she also told Thomas the choice of whether to testify was his to make. The state postconviction court reasonably concluded that, under these circumstances, counsel was not ineffective. Because the state court did not unreasonably apply *Strickland* or base its decision on an unreasonable factual determination, no relief is warranted on Ground Two.

**C. Ground Three**

Thomas contends that trial counsel was ineffective for failing to object to an incomplete jury instruction on the justifiable use of deadly force. He alleges that the instruction omitted language stating that he did not have a duty to retreat and had the right to meet force with force, including deadly force, if he was not engaged in any unlawful activity and was attacked in a place where he had the right to be. Thomas contends that this omission "deprived him of his sole viable defense." (Doc. 13 at 10).

At the postconviction evidentiary hearing, Thomas agreed that the "no duty to retreat" instruction was, indeed, included in the jury instructions, but stated that he did not believe the instruction was accurate or complete. (Doc. 5-2, Ex. 36 at 64-66). Counsel testified that the instruction was not an issue because neither the

prosecution nor defense argued a duty to retreat, and because there was no question that Thomas had been an invited guest and had never been told to leave. (*Id.* at 39-40).

The state postconviction court denied Thomas's claim. Again, the state court found counsel's testimony more credible than Thomas's testimony. (Doc. 5-2, Ex. 37 at 37). The state court found that the question of a duty to retreat was not argued by either side. (*Id.*). The state postconviction court noted that after the trial court instructed the jury on deadly force and non-deadly force, the trial court also read the "no duty to retreat" instruction "as applicable to both non-deadly and deadly force." (*Id.*)

The state postconviction court found that the jury instructions on the justifiable use of deadly force "were not inaccurate, confusing, or misleading." (*Id.*). The state court therefore determined that counsel had no good faith basis to object to the instructions and that any objection would have been overruled. (*Id.*). Accordingly, the state court found that Thomas had not established either deficient performance or resulting prejudice. (*Id.*).

The state postconviction court's ruling was not unreasonable. This Court must defer to the state court's finding that the jury instruction was not inaccurate under Florida law. *See Agan v. Vaughn*, 119 F.3d 1538, 1549 (11th Cir. 1997) (stating that it is a "fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters"); *Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1295 (11th Cir. 2017) (noting that

"although the issue of ineffective assistance—even when based on the failure of counsel to raise a state law claim—is one of constitutional dimension," a court "must defer to the state's construction of its own law when the validity of the claim that [ ] counsel failed to raise turns on state law" (internal quotation marks and citation removed))).

The state court reasonably concluded that counsel was not deficient for failing to challenge an accurate jury instruction. *See id.* at 1297 (stating that an attorney is not ineffective "for failing to perform a futile act, one that would not have gotten his client any relief"). Thomas has not shown that the state court's ruling involved an unreasonable application of *Strickland* or was based on an unreasonable determination of fact. Ground Three therefore does not warrant relief.

**D. Ground Four**

Thomas argues that trial counsel was ineffective for failing to "argue the application of" justifiable use of deadly force during closing arguments. (Doc. 13 at 12). He alleges that counsel should have argued that he had no duty to retreat and had the right to stand his ground and meet force with force. (*Id.*). Thomas argues that counsel's failure misled the jury into believing that he had a duty to retreat.

Counsel testified at the postconviction hearing that she took the approach she believed would be most effective with the jury. (Doc. 5-2, Ex. 36 at 24). She decided that invoking an emotional response in the jurors, rather than arguing legal technicalities, was the best course of action. (*Id.* at 24–25). Counsel also testified

that the facts, including Thomas's statements that Martin was alive when he left the house, "made justifiable use tricky." (*Id.* at 25). Counsel stated that she made strategic choices, based on the case and the evidence elicited at trial, about what to include in her closing argument. (*Id.* at 26). Thomas testified that he believed the jury would have had a better understanding of the justifiable use of deadly force if counsel had addressed it in her closing argument. (*Id.* at 68.)

The state postconviction court denied Thomas's claim. Finding counsel's testimony to be credible, the state court concluded that counsel made a reasonable strategic decision to focus her closing argument on provoking an emotional response from the jury, rather than arguing details of the law. (Doc. 5-2, Ex. 37 at 42–43). The state court found that counsel decided what to argue "based on the case that they had and the evidence and facts that came out." (*Id.* at 43).

The state postconviction court's denial of this claim was reasonable. Thomas has not rebutted the presumption afforded to the state postconviction court's factual findings that counsel's testimony was credible and that counsel made a strategic decision on how to present her closing argument. *See Rolling*, 438 F.3d at 1301; *Franks*, 975 F.3d at 1176.

As counsel testified, and as stated in Ground Three, the question of a duty to retreat was not made a part of the trial.[3] Thomas has not shown that counsel was

[3] In the State's closing argument, the prosecutor made a passing comment that Thomas could have left if he did not like Martin being "touchy feely." (Doc. 5-2, Ex. 12 at 978). The prosecutor made this remark in the context of arguing that the unwanted touching in this case was not provocation sufficient to excuse homicide. (*Id.*); *see* Fla. Stat. § 782.03 (stating that homicide is excusable when committed "by

ineffective for failing to argue a legal theory that was not addressed at trial. Furthermore, the jury was instructed on the justifiable use of deadly force, including the instruction that a person "does not have a duty to retreat if he is in a place where he has a right to be." (Doc. 5-2, Ex. 12 at 1028). Any suggestion that the jury did not understand or apply it is too speculative to warrant federal habeas relief. *See Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (stating that a petitioner's "unsupported allegations" that are "conclusory in nature and lacking factual substantiation" cannot sustain an ineffective assistance claim); *see also Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions.").

The state postconviction court's ruling did not involve an unreasonable application of *Strickland*. Nor was it based on an unreasonable factual determination. Accordingly, Ground Four affords Thomas no relief.

**E. Ground Five**

Thomas asserts that trial counsel was ineffective for failing to call an expert witness to rebut the medical examiner's testimony that Martin was strangled for three to six minutes before he died. Thomas contends that the State relied on this testimony to argue that the sheer length of time that Martin was strangled before his death indicated that Thomas killed him in a violent manner.

---

accident and misfortune in the heat of passion, upon any sudden and sufficient provocation . . . ."). The prosecutor asserted that the provocation of unwanted touching would lead a reasonable person to leave, not to choke Martin. (*Id*. at 978-79). The prosecutor did *not* argue that Thomas had a duty to retreat before using force.

At the postconviction evidentiary hearing, defense counsel testified that she had no reason to believe that an expert would contradict the medical examiner's testimony. (Doc. 5-2, Ex. 36 at 27). Counsel testified that Martin's hyoid bone was broken. (*Id*. at 26). Counsel further testified that she was aware from her experience as a defense attorney that the hyoid bone is a bone in the neck that "is quite often broken during a manual strangulation" and "requires a significant use of force and usually in a violent manner." (*Id*.). Counsel did not believe she had ever spoken to an expert or a medical examiner who would say that strangulation sufficient to break a person's hyoid bone would have been quicker than the evidence indicated or would have been nonviolent. (*Id*. at 26–27).

Counsel was asked about Thomas's allegation that an expert would be able to testify that Martin could have died in under two minutes due to age and poor health, or due to an obstructed carotid artery. (*Id*. at 27–28). Counsel reiterated that she had no basis to believe that an expert would testify consistent with this theory. (*Id*.). She also testified that such testimony could be "far more damaging" to the extent it suggested that Thomas was able to strangle Martin in under two minutes because he "knew what he was doing" by constricting Martin's carotid artery. (*Id*. at 28). Thomas disagreed with defense counsel, testifying that counsel should have called an expert to testify that the duration of the strangulation was impossible to determine. (*Id*. at 74).

The state postconviction court denied Thomas's claim. It found counsel's testimony to be more credible than Thomas's testimony. (*Id*. at 48). The state court

cited counsel's testimony that she had no reason to believe that an expert would testify inconsistently with the medical examiner, and that even if an expert testified that Martin died in under two minutes, that testimony would not necessarily benefit Thomas. (*Id.*). The state postconviction court also cited Thomas's failure to identify any witness who would have contradicted the medical examiner. (*Id.*). The state postconviction court concluded that Thomas had not established either prong of *Strickland*. (*Id.*).

The state postconviction court's decision was reasonable. And Thomas has not rebutted the presumption that the state court's credibility finding is correct. *See Rolling*, 438 F.3d at 1301. That testimony shows that counsel did not believe that the kind of expert Thomas wanted would be available to call in the first instance. Indeed, in these § 2254 proceedings, Thomas has not identified an expert who would have been available to testify to his theory. *See Shaw v. United States*, 729 F. App'x 757, 759 (11th Cir. 2018) ("[C]laims about uncalled witnesses are not favored, because the presentation of testimony involves trial strategy and 'allegations of what a witness would have testified are largely speculative.'" (quoting *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978))). Further, counsel recognized that even if such expert testimony could have been presented, it could prove harmful to the defense.

The state postconviction court did not unreasonably apply *Strickland* or base its decision on an unreasonable factual determination in finding that counsel was not ineffective. Ground Five does not warrant federal habeas relief.

**F. Ground Six**

Thomas argues that trial counsel was ineffective for failing to present an alternative defense that William Austin Hatfield killed Martin. Thomas alleges that counsel was aware that William Hatfield's wife, Crystal Hatfield, provided Thomas with a police report stating that Willian Hatfield had confessed to her and asked her to provide a false alibi for him. Thomas further alleges that Crystal Hatfield refused William Hatfield's request, and William Hatfield planned to flee to Georgia.

At the postconviction evidentiary hearing, counsel testified that she was aware of Crystal Hatfield's statements and raised with Thomas the possibility of arguing that William Hatfield was the responsible party. (Doc. 5-2, Ex. 36 at 29). But counsel testified that Thomas did not want to pursue this theory because William Hatfield was his friend, and Thomas did not believe that William Hatfield had killed Martin. (*Id*. at 29-30). Counsel testified that Thomas maintained that position even after a witness told the prosecutor that William Hatfield was responsible. (*Id*.).

Counsel testified that the defense had investigated the possibility of alternative suspects but had no "hard evidence" that William Hatfield or some other third party was responsible. (*Id*. at 42-43). This lack of hard evidence, counsel testified, kept her from "pushing back" when Thomas rejected the idea of presenting William Hatfield as an alternative suspect. (*Id*.). Thomas testified that he wanted

counsel to call Crystal Hatfield, but that counsel said she did not believe Crystal Hatfield would be a credible witness. (*Id*. at 78).

The state court denied Thomas's claim, again finding counsel's testimony to be more credible than Thomas's testimony. (Doc. 5-2, Ex. 37 at 57). The state court found that Thomas was adamant about *not* arguing that William Hatfield was responsible for Martin's death. (*Id*.). The state postconviction court also found that counsel investigated the possibility of other suspects but uncovered no significant evidence to support the theory that William Hatfield or anyone else killed Martin. (*Id*. at 57-58). The state court concluded that under these circumstances, counsel had not performed deficiently. (*Id*. at 58).

The state court's denial was reasonable. The presumption of correctness afforded to the state postconviction court's factual finding that counsel was more credible than Thomas has not been rebutted. *See Rolling*, 438 F.3d at 1301. After careful review of counsel's testimony, it is clear she was aware of Crystal Hatfield's statements and talked to Thomas about pursuing William Hatfield as an alternative suspect. But Thomas rejected the idea of implicating William Hatfield, and no concrete evidence supported this theory anyway. The state court did not unreasonably apply *Strickland* or base its decision on an unreasonable factual determination when it found that counsel was not ineffective. Accordingly, habeas relief is not warranted on Ground Six.

**G. Ground Seven**

Thomas next contends that he is entitled to relief based on the cumulative

effect of trial counsel's alleged errors. The state court denied this claim because it had denied each of Thomas's claims alleging ineffective assistance of trial counsel. (Doc. 5-2, Ex. 37 at 58). This ruling was reasonable. *See United States v. Joseph*, 978 F.3d 1251, 1265 (11th Cir. 2020) (stating that, when a petitioner "has not established a single error, let alone the aggregation of many errors. . . . [his] cumulative error claim" cannot provide relief).

The state postconviction court's decision was not contrary to, nor did it involve an unreasonable application of, clearly established federal law. And it was not based on an unreasonable determination of fact. Ground Seven does not warrant federal habeas relief.

**H. Ground Eight**

Thomas further asserts that trial counsel was ineffective for using an "inadequate strategy attack." (Doc. 13 at 20). As Respondent contends, Ground Eight restates the argument Thomas raised in Ground Two, in which he alleged that trial counsel was ineffective for failing to insist that he testify. For the same reasons discussed in the analysis of Ground Two, therefore, Thomas is not entitled to federal habeas relief on Ground Eight.

In his reply, Thomas asserts that Ground Eight "was winnowed out of a number of claims and subclaims" raised in his supplemental motion for postconviction relief. (Doc. 22 at 22). He alleges that trial counsel was ineffective for failing to request a special jury instruction defining "depraved mind." *See* Fla. Stat. § 782.04(2) (providing that second-degree murder is the unlawful killing of a

person "when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life").

Thomas did not raise this claim of ineffective assistance of counsel in his section 2254 petition. The Court will not consider new claims raised for the first time in a reply brief. *See Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005) ("[A]rguments raised for the first time in a reply brief are not properly before a reviewing court." (citation omitted)). Ground Eight does not warrant relief.

**I. Ground Nine**

Thomas alleges violations of his Sixth Amendment right to the effective assistance of counsel. He describes the *Strickland* standard and cites other case law addressing the constitutional requirements of criminal defense attorneys. But Thomas does not present any clear claim for relief within Ground Nine. That is, he does not allege any specific error of counsel or the state court.

Thomas instead alleges in his reply that the claim in Ground Nine was "winnowed out of a number of claims and sub-claims" raised in his motion for postconviction relief. (Doc. 22 at 25). He contends that trial counsel was ineffective for failing to recognize that "extreme recklessness" or "an impulsive overreaction to an attack or injury" will not sustain a conviction for second-degree murder. (*Id.*). Thomas did not raise this claim in his federal habeas petition. Because he presented the claim for the first time in his reply brief, the Court will not consider

it. *See Herring*, 397 F.3d at 1342. Thus, Ground Nine does not warrant federal habeas relief.

**J. Ground Ten**

Thomas contends that the state trial court erred by permitting the prosecutor to use a peremptory strike on an African American juror. Thomas asserts that the state trial court's denial of this claim was contrary to or involved an unreasonable application of *Batson v. Kentucky*, 476 U.S. 79 (1986). Because Thomas is proceeding pro se, the Court liberally construes Ground Ten as alleging a violation of Thomas's Fourteenth Amendment equal protection rights. *See id.* at 89 (holding that the Equal Protection Clause prohibits a prosecutor from peremptorily striking a prospective juror on account of the juror's race).

Respondent contends that this claim is procedurally defaulted because Thomas did not present it as a federal claim in state court. The record supports Respondent's argument. On direct appeal, Thomas raised this claim of trial court error as a *state-law* claim. (Doc. 5-2, Ex. 19 at 2–7). Thomas did not cite federal law or allege a violation of his federal rights. (*Id.*).

In his reply, Thomas asserts that the state case law he cited relied on federal law and that the State treated his claim as a federal issue in its answer brief. But a petitioner does not fairly present a federal claim to a state court "if that court must read beyond a petition or a brief" that does not itself bring a federal claim. *Lucas v. Sec'y, Dep't of Corr.*, 682 F.3d 1342, 1352 (11th Cir. 2012). Nor did the State in its

answer brief treat Thomas's claim as raising a federal constitutional question. (Doc. 5-2, Ex. 20 at 2–6).

Thomas did not fairly present a federal claim to the state court. He has not shown that an exception applies to excuse the resulting procedural default either. *See Spencer*, 609 F.3d at 1179–80. But even if Thomas exhausted a federal claim, he has not shown that the state court's denial of that claim was contrary to or involved an unreasonable application of *Batson*.

This claim concerns the State's peremptory strike of prospective juror 14. During jury selection, the State first sought to challenge this juror for cause:

> [PROSECUTOR]: Move for cause on Juror No. 14.
>
> THE COURT: Defense agree or disagree?
>
> [COUNSEL]: Disagree.
>
> THE COURT: State your grounds.
>
> [PROSECUTOR]: When I was watching the voir dire of the defense, it appeared to me that his eyes were closing as if he was not paying attention and possibility [sic] falling asleep.
>
> THE COURT: That's not part of the record. I'll deny for cause. What says the State?
>
> [PROSECUTOR]: Move for peremptory on Juror No. 14 for the reason I just gave.
>
> [COUNSEL]: And, Your Honor, defense would ask for a race-neutral reason, Juror No. 14. He does appear to be African-American and a protected class.
>
> THE COURT: Go ahead and give a reason, counsel.
>
> [PROSECUTOR]: Reason is that he appeared to be falling asleep to the State during defense voir dire.

> THE COURT: Anything else?
>
> [COUNSEL]: Your Honor, we would put on the record that there was no mention on the record of that.
>
> THE COURT: Okay. I'll allow the challenge for cause [sic]. It's race-neutral and genuine on its face.

(Doc. 5-2, Ex. 12 at 210–11).

As an initial matter, it is apparent that the trial court misspoke at the end of this exchange and allowed the State's peremptory strike, not its challenge *for cause*. Thomas has not shown that the state court denied his federal constitutional rights in allowing this peremptory strike.

The proponent of a challenge for cause must have a specific reason to believe the prospective juror cannot be impartial. *See Teasley v. Warden, Macon State Prison*, 978 F.3d 1349, 1356 (11th Cir. 2020) (explaining that "[b]ecause the Sixth Amendment provides the right to an impartial jury, demonstrated bias in the responses to questions on *voir dire* may result in a jury being excused for cause") (quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 845, 554 (1984)).

The record must support the proponent's allegation that the prospective juror is disqualified from serving. *See McDonough*, 464 U.S. at 554 (stating that bias sufficient to sustain a cause challenge must go beyond "hints" and must have been "demonstrated"); *Teasley*, 978 F.3d at 1356 (stating that to exclude a prospective juror for cause, "a party must demonstrate that the juror in question exhibited actual bias by showing either an express admission of bias or facts demonstrating

such a close connection to the present case that bias must be presumed" (internal quotation marks and citation omitted)). Accordingly, the prosecutor's personal observation that the prospective juror seemed sleepy was inadequate to support a challenge for cause because it lacked record support.

A prosecutor's reason for a peremptory challenge is not required to rise to the level of a challenge for cause. *Hernandez v. New York*, 500 U.S. 352, 362–63 (1991). Courts use a three-step process for assessing whether a peremptory strike is based on race in violation of the Equal Protection Clause under *Batson*. If the defendant first makes a prima facie showing that the peremptory strike was based on race, then the prosecution must provide a race-neutral reason for the strike. *See Vinson v. Koch Foods of Ala., LLC*, 12 F.4th 1270, 1276 (11th Cir. 2021). At this stage, the prosecutor is not required to provide "an explanation that is persuasive, or even plausible." *Purkett v. Elm*, 514 U.S. 765, 768 (1995). The prosecutor's reason "will be deemed race neutral" so long as there is no "discriminatory intent [] inherent in the prosecutor's explanation." *Hernandez*, 500 U.S. at 360.

Finally, in the third step, the trial judge must determine whether the explanation is sincere or merely a pretext to strike a juror on the basis of race. *See Vinson*, 12 F.4th at 1276. "In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed." *Hernandez*, 500 U.S. at 365. "Evaluation of the prosecutor's state of mind based on demeanor and credibility," which is often "the

best evidence" in making such a determination, "lies peculiarly within a trial judge's province." *Id.*

Here, the state court found the prosecutor's observation of the juror to be a race-neutral, genuine reason for the prosecution's use of a peremptory strike. Thomas has not established a basis to find that the state court's acceptance of the prosecutor's reason as genuine violated his constitutional rights. *See, e.g.*, *United States v. Cordoba-Mosquera*, 212 F.3d 1194, 1198 (11th Cir. 2000) (stating that deference to a trial judge's determination that a peremptory strike was not pretextual "is particularly warranted here, where the proffered race-neutral explanation centered on the juror's 'body language' and 'mannerisms' that signaled inattentiveness, behaviors that are especially given to on-the-spot consideration").

Thomas has not shown that the state court's denial of any federal equal protection claim was contrary to or involved an unreasonable application of *Baston* or was based on an unreasonable factual determination. No federal habeas relief is warranted on Ground Ten.

**K. Ground Eleven**

In his eleventh claim, Thomas argues that the state appellate court erred in striking his amended initial brief on postconviction appeal. Because this claim does not challenge the validity of Thomas's conviction or sentence, it is not cognizable on federal habeas review. *See Quince v. Crosby*, 360 F.3d 1259, 1262 (11th Cir. 2004) ("[W]hile habeas relief is available to address defects in a criminal defendant's

conviction and sentence, an alleged defect in a collateral proceeding does not state a basis for habeas relief."). Thomas is not entitled to relief on Ground Eleven.

**L. Ground Twelve**

Thomas argues that trial counsel was ineffective for failing to preserve for appellate review the prosecutor's peremptory strike of the African American juror discussed in Ground Ten.[4]

Thomas concedes that this claim of ineffective assistance of trial counsel is procedurally defaulted because he did not raise it in state court. But he argues that the cause-and-prejudice exception, as discussed in *Martinez v. Ryan*, 566 U.S. 1 (2012), excuses the default. Under *Martinez*, a § 2254 petitioner can show cause for the default of an ineffective assistance of trial counsel claim when "in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective," and the defaulted claim is "substantial" in that it "has some merit." *Id.* at 14, 17.

Thomas's defaulted claim of ineffective assistance of trial counsel does not meet this standard. For the reasons discussed in Ground Ten, Thomas has not shown that his Fourteenth Amendment right to equal protection was violated when the state trial court allowed the prosecutor's peremptory strike of prospective juror 14. Counsel is not ineffective for failing to raise an argument that would not have afforded relief. *See Pinkney*, 876 F.3d at 1297. Therefore, *Martinez*'s limited

[4] Thomas asserts in Ground Ten that he exhausted a federal constitutional claim, but here asserts that counsel did not properly preserve the *Batson* challenge for appeal.

exception does not apply to excuse the procedural default of Thomas's claim of ineffective assistance of trial counsel. Ground Twelve does not warrant federal habeas relief.

## V. Certificate of Appealability

A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Instead, a district court or court of appeals must first issue a certificate of appealability ("COA"). *Id*. "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a COA, Thomas must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Thomas has not made the requisite showing. Finally, because Thomas is not entitled to a COA, he is not entitled to appeal *in forma pauperis*.

It is therefore **ORDERED** that Thomas's Amended Petition for Writ of Habeas Corpus (Doc. 13) is **DENIED**. The **CLERK** is directed to enter judgment against Thomas and in Respondent's favor, to terminate any pending motions and deadlines, and to **CLOSE** this case.

**ORDERED** in Tampa, Florida, on September 15, 2026.

John L. Badalamenti

**JOHN L. BADALAMENTI**
UNITED STATES DISTRICT JUDGE